IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Christopher Sojka, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 10 C 1607 |
| v. | ) | |
| | ) | Suzanne B. Conlon, Judge |
| Bovis Lend Lease, Inc. a/k/a Bovis | ) | |
| Construction Corp., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Christopher Sojka, Jr. was injured during construction of the Chicago building known as

the Trump Tower. He filed a negligence action in state court against the project's construction

manager, Bovis Lend Lease, Inc. ("Bovis"). Bovis removed the case to federal court based on

diversity jurisdiction and now moves for summary judgment.

## I. Background

### A. Local Rule 56.1

Local Rule 56.1(a) requires Bovis to submit a statement of material facts consisting of no

more than 80 short numbered paragraphs and including citation of supporting record evidence.

Sojka must then respond to each paragraph, and in the case of a dispute, must cite record support.

N.D. Ill. Loc. R. 56.1(b)(3). Sojka may also submit up to 40 additional statements of material

fact, supported by reference to the record, and Bovis may reply to those additional statements.

*Id.* 56.1(a), (b)(3). Failure to properly contest a fact results in admission of that fact. *Smith v.

Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). As the non-moving party, all factual disputes are

1

resolved in Sojka's favor, and he receives the benefit of all reasonable inferences. *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). However, the court is not required to accept Sojka's characterization of the record when Bovis has accurately supported a fact with a record citation. *See Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). Accordingly, when facts are undisputed, the court cites the pertinent statement of fact, *see* Def. Facts (Dkt. No. 48); Pl. Facts (Dkt. No. 55). When facts are disputed in the record, the court cites the relevant portions of the record.

## B. The Injury

Sojka was employed as a carpenter's apprentice by James McHugh Construction ("McHugh"), the trade contractor responsible for constructing the Trump Tower's concrete superstructure. Def. Facts ¶¶ 1, 9, 17. Part of McHugh's job was to design and erect perimeter netting on all open floors of the Trump Tower, and McHugh continued to maintain the netting after it was erected. Def. Ex. 5 at 134:16–136:14. On January 31, 2001, the temperature was below zero, and it was extremely windy with driving snow. Def. Ex. 2 at 55:22–56:14. Sojka was repairing a steel cable securing loose perimeter netting. *Id.* at 55:13–57:13. While he was tightening a clamp above his head, the wind knocked him back. *Id.* at 53:2-4. He grabbed the cable, something snapped, and a piece of metal flew down and pierced his eye. *Id.* at 53:4-10. Sojka contends the McHugh-supplied safety glasses he was wearing did not fit his face adequately and left a gap over the top, allowing a piece of metal to penetrate his eye. Def. Facts ¶ 20. After the accident, a McHugh carpenter was the first to respond, followed by unidentified plumbers or electricians. *Id.* ¶ 24. Sojka passed Bovis employees on the stairs up to the floor he was working on, but did not see a Bovis employee during the twenty minutes he worked on the

2

perimeter netting. Def. Ex. 2 at 83:1-24. The area "was pretty secluded from many viewpoints that weren't favorable to warmth." *Id.* at 83:23-24.

Sojka alleges Bovis breached its duties to provide a safe workplace and to ensure work was performed in a safe manner. Bovis's liability turns on the amount of control it retained over the safety aspects of McHugh's work and its knowledge of potential hazards.

## C. General Safety

Bovis was hired as the construction manager for the Trump Tower construction project. Pl. Facts ¶ 1. It was empowered to act as the owner's agent in arranging for, monitoring, supervising, administering, and contracting for the construction. Pl. Ex. 1 at BLL 0014. Part of Bovis's duties included managing, supervising, and coordinating construction activities with the owner, architect, consultants, trade contractors, governmental authorities, and others. *Id.* at BLL 0044. Bovis's contract with the owner also included responsibilities over workplace safety. Pl. Facts ¶ 4. Bovis was required to make recommendations about establishing and implementing safety measures for all trade contractors. Pl. Ex. 1 at BLL 0054, 0101. Bovis also was required to designate a site safety superintendent responsible for safety precautions and for enforcing site safety rules. Pl. Facts ¶ 5.

Bovis created a site specific safety plan and trade contractors had to submit a site specific safety manual outlining the general means and methods for performance of their work. Pl. Ex. 3; Pl. Ex. 2 at 20:16-21. Bovis's site specific safety plan included specific subcontractor safety requirements and twenty additional mandatory safety rules. Pl. Facts ¶ 17; Pl. Ex. 3 at BLL 0565–0597. One of the safety rules pertained to personal protective equipment, including eye protection. Pl. Ex 3 at BLL 0750–0573. Bovis's site safety manager, Martin Leik, had to

3

approve each trade contractor's safety manual. Pl. Facts ¶ 8; Pl. Ex. 2 at 20:16-21. If a trade contractor's proposed methods of performing its work did not comply with Bovis's safety requirements, Leik would work with the trade contractor to ensure the work would be done in a safe manner. Pl. Ex. 2 at 61:20–62:11; Def. Ex. 6 at 124:8-19.

Bovis's site specific safety plan detailed safety training requirements for trade contractors and their employees. All new employees had to attend an hour-long safety orientation conducted by Bovis's site safety manager, Leik, before beginning work. Pl. Facts ¶ 8. At orientation, each employee received an "Incident & Injury Free Handbook" created by Bovis that contained mandatory safety rules. *Id.* ¶ 14. McHugh's foremen had to attend an additional Bovis safety training. *Id.* ¶ 15. Each trade contractor had to conduct weekly toolbox safety talks for their employees and give Bovis minutes from the meeting. *Id.* ¶ 17. Bovis sometimes directed topics to be covered at the safety talks. *Id.* ¶ 13. Leik tried to attend at least one McHugh safety meeting each week. *Id.* ¶ 22. In addition, Bovis ran supervisor safety meetings attended by multiple contractors and held a safety coordination meeting every other week with just McHugh. *Id.* ¶ 16.

As safety manager, Leik audited each subcontractor to ensure compliance with its own safety program and with Bovis's typically more stringent safety policies. Pl. Facts ¶ 22. He also conducted a daily walkthrough of the work site. *Id.* ¶ 8. Leik began at the top of the work site, checked the weather, and confirmed the trade contractors' plans for the day. *Id.* ¶ 10. On his walk down, he looked for safety precautions, such as issues with perimeter protection, floor holes, and other hazards. *Id.* When Leik noticed a safety hazard, he would immediately contact the foreman for the relevant trade contractor. *Id.* ¶ 11. If he deemed the hazard to be high risk,

he would not leave until the hazard was corrected. *Id.* If Leik noticed that work was performed in an unsafe manner, he would approach the worker directly if he felt the issue needed to be addressed immediately. Pl. Ex. 2 at 37:2–39:14. Otherwise, he would contact the relevant foreman. *Id.* at 38:11-15. In either case, Leik stopped the work until the safety concern was addressed. *Id.* at 38:7-10, 39:15-22.

Bovis employed a structural superintendent, John Taheny, whose job included managing trade contractors involved with the building's structure, primarily McHugh and the hoist operator. Pl. Ex. 7 at 9:10-14. Part of Taheny's job entailed making sure McHugh ran a safe and clean job site, and to that end he typically observed McHugh's toolbox meetings with its crews. *Id.* at 10:11–11:16. He also sat in on McHugh's retraining sessions as decking and netting reached higher levels of the building to ensure safety concerns were addressed. *Id.* at 37:8–38:20. One of Taheny's daily activities was walking the floors he was responsible for, looking for safety concerns with McHugh's work. *Id.* at 17:10-17. While walking the floors, Taheny enforced aspects of Bovis's safety plan, and on occasion he found perimeter netting that was not secured and had to be fixed by McHugh. *Id.* at 40:6-10, 41:23–42:11.

Wind was a constant problem on the Trump Tower project. Pl. Facts ¶ 29. Taheny monitored the weather and spoke with McHugh's concrete superintendent on a daily basis about the weather. Pl. Ex. 7 at 44:15-20. Sometimes, Taheny determined that the wind was too strong for the man hoists to operate, and McHugh was unable to work on the upper floors. *Id.* at 48:11–49:7. McHugh occasionally determined the weather made it too dangerous for its employees and shut down work. *Id.* at 47:23–48:10. Leik, too, was responsible for monitoring

weather conditions for safety issues. Pl. Ex. 2 at 114:21–115:13. If he thought the wind presented an immediate safety concern, he could stop work. *Id.* at 111:11-19, 112:7-15.

McHugh also had safety requirements in its contract with the project owner, which was executed by Bovis as the owner's agent. Def. Ex. 3 at BLL 0323, 0489. The trade contract required McHugh to provide all tools and equipment necessary to do its work, and McHugh agreed to abide by all applicable OSHA safety regulations. Def. Facts ¶ 11. McHugh was required to create a site specific safety plan for its employees. *Id.* ¶¶ 12–13. McHugh employed two full-time safety officers who were on site daily. Def. Ex. 5 at 21:11-16.

## E. Eye Protection

Of twenty general safety rules in Bovis's site specific safety plan, one pertained specifically to personal protective equipment ("PPE"), encompassing the use of hard hats, hearing protection, gloves, clothing, eye protection, and other items. Pl. Ex. 3 at BLL 0570–0573. All employees were required to wear ANSI Z-87 safety glasses with rigid side shields at all times. Def. Ex. 7 at BLL 0572. Bovis's safety plan specified that "additional eye and face protection must be worn such as cutting goggles/glasses, welding hoods, chemical goggles, face shields, etc.," and held supervisors responsible for training and ensuring compliance. *Id.* at BLL 0570, 0572. The Bovis safety plan specified that each trade contractor was responsible for working with Bovis to "ensure that all hazards in which PPE could reduce the potential for injury or illness are identified" and that Bovis and trade contractors' safety representatives were required to reevaluate the suitability of previously selected personal protective equipment, including the adequacy of the equipment selected, the adequacy of the training and fitting of personal protective equipment, and the level of exposure. Pl. Ex. 3 at BLL

0570. An employee must be retrained in the use of PPE if either the employee's supervisor or a member of Bovis's safety team believes the employee does not have the understanding or skill required to use the PPE. *Id.* at BLL 0571.

Bovis's site specific safety plan made McHugh and other trade contractors responsible for providing eye protection for their employees. Def. Facts ¶ 15. The parties dispute whether McHugh's contract also contained eye protection requirements; McHugh actually provided its employees with safety glasses, purchased eye protection, trained new employees on wearing eye protection, and enforced the use of eye protection. *Id.* ¶ 14.

Sojka admits that he never told McHugh or Bovis before the accident that his eyewear was inadequate. Def. Facts ¶ 25. As far as Sojka knows, Bovis was never advised his glasses or any of the safety glasses provided by McHugh were inadequate. *Id.* ¶¶ 26–27.

## II. Analysis

### A. Subject Matter Jurisdiction

Jurisdiction is predicated on diversity. 28 U.S.C. § 1332(a). Sojka is a citizen of Illinois. Def. Facts ¶ 3. Bovis is a Florida corporation with its principal place of business in New York. *Id.* ¶¶ 2, 4. Bovis asserts in its Rule 56.1 Statements that subject matter jurisdiction existed based on complete diversity; Sojka denies diversity exists because his employer, McHugh, is a citizen of Illinois and is a necessary party. Pl. Resp. to Def. Facts ¶ 5. However, neither he nor Bovis commented upon this in their briefs. Despite this failure, the court is obligated to ensure jurisdiction exists. *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005).

Complete diversity requires that no defendant shares citizenship with any plaintiff. *Strawbridge v. Curtiss*, 7 U.S. 267 (1806). If McHugh were a defendant, diversity would be

7

destroyed. But Sojka is precluded from suing his employer because of the Illinois Workers'

Compensation Act, 820 ILCS 305/5(a). If Bovis files a third party complaint for contribution

against McHugh, *see* 820 ILCS 305/5(b), the citizenship of a third party defendant would not

affect jurisdiction over the original complaint. *See Smart Mktg Gp. v. Publ'ns Int'l Ltd.*, 624

F.3d 824, 827–28 (7th Cir. 2010). Therefore, the court has diversity jurisdiction.

## B. Motion for Summary Judgment

Summary judgment is appropriate if Bovis shows there is no genuine dispute of material

fact and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Johnson v.*

*Manitowoc County*, 635 F.3d 331, 334 (7th Cir. 2011). Bovis bears the initial burden of

establishing the record contains no material question of fact as to an essential element of Sojka's

case. *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 657 (7th Cir. 2011).

Then, Sojka must point to evidence that raises a genuine issue of material fact. *Id.* Illinois law

governs this diversity case. *Erie RR Co. v. Tompkins*, 304 U.S. 64 (1938).

A general contractor has no duty to ensure the safety of an independent contractor's

employee under Illinois law. *Wilfong v. L.J. Dodd Constr.*, 930 N.E.2d 511, 526 (Ill. App. Ct.

2010). The exception to the rule is stated in § 414 of the Restatement (Second) of Torts:

> One who entrusts work to an independent contractor, but who retains the
> control of any part of the work, is subject to liability for physical harm to others
> for whose safety the employer owes a duty to exercise reasonable care, which is
> caused by his failure to exercise his control with reasonable care.

*See Larson v. Commonwealth Edison Co.*, 211 N.E.2d 247 (Ill. 1965) (recognizing § 414 as a

statement of Illinois law). Besides duty, the remaining elements of a construction negligence

claim are breach, causation, and injury. *Calderon v. Residential Homes of Am., Inc.*, 885 N.E.2d 1138, 1145 (Ill. App. Ct. 2008).

Bovis first argues that § 414 is on its face inapplicable because as construction manager, it facilitated McHugh's contract with the project owner but did not itself entrust any work to McHugh. Next, it argues any duty it had to Sojka did not extend to the choice of eye protection he used. Finally, Bovis contends even if it had a duty, Sojka has no evidence that the duty was breached.

## 1. Entrustment of Work

In a supplemental memorandum, Bovis argues a new Illinois appellate case, *O'Connell v. Turner Construction Co.*, No. 1-09-3442, 2011 WL 1124004 (Ill. App. Ct. Mar. 25, 2011), establishes that § 414 is inapplicable because Bovis did not entrust work to McHugh. Bovis points out that McHugh's contract was with the owner; Bovis signed the contract as the owner's agent. Def. Suppl. R. at BLL 0323. In addition, Bovis's contract specifies that the owner is the one who awards a trade contract, although "with the consultation and cooperation of Construction Manager." *Id.* at BLL 0061.

In *O'Connell*, defendant Turner Construction Co. acted as a construction manager for a school district building a new school. 2011 WL 1124004, at *1. The injured plaintiff was employed by a subcontractor hired by an independent contractor that was hired by the school district. *Id.* at *2. The Illinois Appellate Court held that plaintiff had no evidence Turner actually selected the contractors or subcontractors; Turner merely drafted the construction contracts, handled the bidding process, and advised the school district about which bids to accept. *Id.* at *1, *3. The school district, not Turner, signed all the contracts. *Id.* at *3.

9

*O'Connell* is distinguishable. There, the plaintiff's employer was one step removed from Turner and the school district. The school district selected a contractor, and that contractor selected plaintiff's employer as a subcontractor. *O'Connell*, 2011 WL 1124004, at *2. There was no connection between plaintiff's employer and the school district. Here, Sojka's employer, McHugh, was hired directly by the owner. Nor is a direct contract between Bovis and McHugh strictly necessary. Bovis could have crafted its role as construction manager narrowly, as the construction manager did in *O'Connell*. But Bovis's contract with the owner was much broader in scope and gave Bovis significant authority to act as the owner's agent. Construing the facts in a light most favorable to Sojka, Bovis had sufficient authority as the owner's agent over the selection of trade contractors to have control over the selection of McHugh.

## 2. Duty

Bovis next argues it did not owe a duty to Sojka. The existence of a duty under § 414 is frequently litigated, but the Illinois appellate courts have not reached a consensus about the applicable standard. The Illinois Supreme Court has not resolved the issue, but the Seventh Circuit has predicted how the Illinois Supreme Court would interpret § 414. *See Aguirre v. Turner Constr. Co.*, 501 F.3d 825 (7th Cir. 2007).

The central issue in determining whether Bovis owed Sojka a duty is the extent of control it retained over McHugh's work. *Aguirre*, 501 F.3d at 829. The duty imposed on a general contractor is defined by the control it retained. Section 414 applies when a general contractor retains "some degree of control over the manner in which the work is done," but not enough control to be vicariously liable. *Id.* at 829–30 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). "There must be such a retention of a right of supervision that the contractor is not

10

entirely free to do the work in his own way." RESTATEMENT (SECOND) OF TORTS § 414 cmt. c.

The general contractor must exercise the control it retains with reasonable care. *Aguirre*, 501

F.3d at 829–30. At a minimum, that means a general contractor who knows or should know a

subcontractor is doing work in an unreasonably dangerous way or has carelessly created a

dangerous condition must use that control to prevent or remedy the situation. RESTATEMENT

(SECOND) OF TORTS § 414 cmt. b. The amount of control Bovis retained is a question of fact.

*Diaz v. Legat Architects, Inc.*, 920 N.E.2d 582, 600 (Ill. App. Ct. 2009). Whether that control

gives rise to a duty is a question of law. *Gregory v. Beazer East*, 892 N.E.2d 563, 572 (Ill. App.

Ct. 2008).

In *Aguirre*, the Seventh Circuit considered whether a general contractor retained enough

control over a subcontractor's work to give rise to a duty of care toward a bricklayer who fell

from a scaffold. In finding a duty existed, the court relied heavily on *Bokodi v. Foster Wheeler*

*Robbins, Inc.*, 728 N.E.2d 726 (Ill. App. Ct. 2000), in which a general contractor was found to

owe a duty of care to a subcontractor's employee who injured his back while lifting sheets of

metal siding with a manual well wheel instead of an electric rope tugger. The Seventh Circuit

listed the factors that led to a finding of a duty in *Bokodi*:

> [T]he general contractor provided 29 safety measures and procedures that
> subcontractors were required to follow, employed safety personnel to monitor the
> site for compliance with its safety guidelines, gave its own employees broad
> powers to halt any subcontractor work based on a perception of an unsafe working
> environment, required subcontractors to conduct safety training meetings that the
> general contractor's employees could monitor, and required subcontractors to
> participate in its own safety programs.

*Id.* at 830 (citing *Bokodi*, 728 N.E.2d at 735). The Seventh Circuit noted the *Aguirre* general

contractor had a similar plan in place, including creating a 125-page safety program that all

11

subcontractors were required to follow, hiring a safety coordinator to oversee that program, holding monthly safety meetings, mandating that subcontractors conduct regular safety meetings, requiring subcontractors to design their own site specific safety programs, doing daily walkthroughs of the work site to monitor safety compliance, and possessing and exercising the authority to stop any subcontractor work being performed in an unsafe manner. *Id.* at 827. In addition, the Seventh Circuit found the factors in *Aguirre* even more compelling than those in *Bokodi* because the *Aguirre* general contractor imposed additional safety requirements specific to scaffolding. *Id.* at 830–31. The general contractor imposed 23 rules about scaffold construction, its employees walked the site regularly and could require the subcontractor to correct any visible deficiencies in a scaffold, it inspected many of the scaffolds, and even imposed specific alternative design requirements on the scaffold from which plaintiff fell. *Id.* These facts established a duty because the safety program sufficiently affected the subcontractor's means and methods by which it sought to ensure its employees' safety. *Id.* at 831.

The control Bovis exercised is virtually indistinguishable from the control found sufficient in *Aguirre* and *Bokodi*. Bovis created a site specific safety plan that McHugh had to follow. Work could not begin until Bovis approved McHugh's site specific safety plan that complied with Bovis's. Bovis conducted new employee safety orientation, distributed a safety manual to all employees, chaired safety coordination meetings with McHugh every other week, and led supervisor safety meetings. Bovis required that McHugh conduct weekly toolbox meetings about safety and would frequently attend. Two Bovis employees conducted daily rounds of the work site checking for safety compliance and had the authority to correct safety violations and stop work until violations were corrected. This amount of control is sufficient to

trigger at least the minimum duty to prevent or remedy work Bovis knew or should have known was performed in an unreasonably dangerous manner.

Bovis's attempt to distinguish *Aguirre* is unavailing. Bovis contends that it did not exert the same control over eye protection that the general contractor in *Aguirre* exerted over scaffolding. Unlike the 23 rules specific to scaffolding in *Aguirre*, Bovis allowed McHugh to determine the type of eye protection McHugh employees wore. However, the Seventh Circuit considered the scaffolding rules to be beyond what was found sufficient in *Bokodi*; the rules were not necessary to the finding of a duty. *See Aguirre*, 501 F.3d at 830. Nor can Bovis escape its duty by pointing to McHugh's involvement in safety matters. Nothing in § 414 precludes a general contractor and a subcontractor from retaining joint control over an aspect of the job. *See Aguirre v. Turner Constr. Co.*, 582 F.3d 808, 811 (7th Cir. 2009) (noting that general contractor and subcontractor assumed joint responsibility for work site safety).

Bovis attempts to define the relevant duty narrowly to encompass only a duty to determine the kind of eye protection Sojka should have used. It argues such a duty could not apply because it did not retain control over the type of eye protection McHugh provided its employees. However, focusing only on eye protection does not diminish Bovis's control over safety in general, which gives rise to a duty as discussed above. Sojka presented evidence that Bovis had the authority to become involved in eye protection matters. Bovis specified that all safety glasses must be ANSI compliant, and it could intervene if a McHugh employee was observed wearing safety glasses improperly or did not use the right level of protection. The evidence shows that Bovis retained authority to single out hazards that require more protection

13

than just safety goggles. Even though McHugh provided safety glasses, Bovis retained some control over the use of eye protection. But its duty is limited to the control it retained.

## 3. Breach

Finally, Bovis argues that even if it had a duty, there is no evidence of a breach. Bovis asserts it had no notice that Sojka was using inappropriate eye protection for the severe weather conditions that existed on the date of the accident. The issue of breach is ordinarily a question of fact for the jury, provided that Sojka has established a genuine issue of material fact that a breach occurred. *Martens v. MCL Constr. Corp.*, 807 N.E.2d 480, 489 (Ill. App. Ct. 2004). The issue of breach has not been the topic of discussion in most § 414 cases. However, one rule that has emerged is that "the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran v. George Sollitt Constr. Co.*, 832 N.E.2d 355, 879–80 (Ill. App. Ct. 2005); *see Calderon v. Residential Homes of Am., Inc.*, 885 N.E.2d 1138, 1151 (Ill. App. Ct. 2008).

Bovis contends without challenge that Sojka never told McHugh or Bovis that his safety glasses were inadequate. Nor does Sojka contest that the record contains no evidence that a Bovis employee was in the area when the accident occurred. Therefore, there is no dispute that Bovis had no actual knowledge about Sojka's particular predicament.

The possibility still remains that Bovis could be charged with constructive notice. However, Sojka omits from his response brief any discussion about possible breaches. He discusses proximate cause, which Bovis did not raise, but does not respond to Bovis's argument about breach. The complaint lists several ways in which Bovis could have breached a duty. *See* Complaint ¶ 18 (Dkt. No. 1). However, Sojka cannot rest on complaint allegations at summary

14

judgment. His brief does not discuss any of the alleged acts or omissions and consequently he has not linked them to evidence in the record to create a factual dispute for trial. This court does not craft arguments for a party or scour the record for facts to support arguments. *See Costello v. Grundon*, 625 F.3d 342, 367 n.10 (7th Cir. 2010); *Agryopoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008). Sojka proffers no evidence or argument to support a theory that Bovis had constructive knowledge of a hazard. He has therefore waived a constructive notice argument. *See Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003).

### III. Conclusion

The facts taken in a light most favorable to Sojka establish that Bovis entrusted work to McHugh and owed Sojka a duty of care. However, Sojka failed to present evidence that Bovis breached its duty of care with respect to his accident. Without evidence of a breach, no genuine issue of material fact exists for trial. Accordingly, summary judgment is granted.

ENTER:

Suzanne B. Conlon
United States District Judge

May 27, 2011